And we will hear first from Mr. Sahat. Did I pronounce that correctly? Yes, you did, Your Honor. Good morning, Your Honor. You may proceed. Cameron Seahead on behalf of the appellant. May it please the court, this is a case involving deliberate indifference to Mr. Williams's serious medical conditions while he was incarcerated at the Twin Tower County Jail. Mr. Williams was arrested on June 16th for a parole violation and upon admission, medical staff noted him to be suffering from schizoaffective disorder, manic depression and insomnia. A lung scan revealed no abnormalities of his lungs and he was in good health in that regard. June 17th, a bomber was noted, which is a behavioral observation mental health referral that the guard noted him to act abnormally but consistent with the symptoms of his mental disorder. He was sent for a mental health evaluation and to be eventually housed in the mental health unit of the jail. August 21st, he was transferred into a dormitory style housing, housing 88 inmates in close proximity to one another in double bunks and with shared facilities, all against CDC guidelines at a time for COVID preventions and so forth. On August 23rd, Mr. Williams started to display symptoms of his illness, including shortness of breath, dizziness, lethargia and chills, all of which were beginning to, or had been informed of by himself and other inmates to the individuals in charge of his welfare, including custody and medical staff. This information came out of the coroner's investigator report, who noted that Mr. Williams started to show symptoms of respiratory distress as early as three weeks before he had passed away. They phrase it up to because there's some indications, some days before he passed, others as late as three weeks. In terms of the deliberate indifference elements of some of the claims, I think, well, maybe you can frame it for us. And what's the argument that it's deliberate indifference? Is it just the violation of the CDC guidelines? Is it the placing him? Is it, would it be placing others into the group living arrangement? Is there anything in the complaint that deals with a failure to intervene in that three week period? I guess, could you help us zero in on where we should find that pleaded? Sure. Yes, it was in the complaint of certainly under the 14th Amendment cause of action claim, what reasonable alternative measures were available to the jailers once they were apprised of the symptoms. And what were those? Those would have been to either isolate Mr. Or, well, there's two part. Either take, make arrangements not to congregate everyone in such close proximity to one another. And B, when he started to become symptomatic, to take him out into an infirmary or medical center. So as to the first piece, does it matter under our deliberate indifference cases whether they actually had options available to them? I mean, this is still, you know, we're a year into the pandemic. Do you have to identify options that would have been available elsewhere? Certainly, to treat those symptoms as soon as they came up, the civilian segment had the benefit of, you know, getting that early treatment short of being hospitalized and placed on a ventilator. Mr. Williams did not even have that benefit whatsoever. He, when they found him, he was in cardiac arrest at the very tail end of the symptoms. But he didn't seek, he asked for a vaccine a second time, but he didn't seek treatment during this time. I guess, again, for deliberate indifference, it strikes me that there must be some alternative, right, an option. And I don't think just simply saying that civilians were differently situated than detainees does it. Where do you point? Well, when you're showing symptoms of shortness of breath, medical staff has an obligation to care for you. In a custody setting, jailers, inmates don't have the benefit of seeking their own treatment. They're relying exclusively at the... But does the complaint have any facts that support the elements of the underlying deliberate indifference claim? Because under Farmer, you have to show that the... When we're looking at the individuals, under Farmer, you have to show that the individual was aware of the risk and drew the inference that the course of conduct the individual took presented that risk. The complaint is totally devoid of facts. It just says that he started showing symptoms of COVID at some point and then at some point later, he died. That doesn't say anything about whether it was made known to anyone that he had it. Did he say something about it? Did he complain about it? Did he say, I'm short of breath? Did he... How... There's nothing in the complaint that fills in that gap. Correct, Your Honor. And if I can add on to that, after Gordon versus County of Orange, as a pretrial detainee, there's no longer a requirement to show the subjective element, which is what Your Honor was referencing in the Farmer. Okay. Oh, so... Alright. So he's pretrial and so Farmer doesn't apply and it's the objective standard. Correct. Exactly. So it's more of an objective unreasonableness at that point. And he did... He and at least other inmates did notify the jailers of his symptoms, aside from the fact that it would have likely been noticeable to everyone as he's having asphyxia or shortness of breath for this period of time. So in the... Before he was symptomatic, what... What relevance is it that he was offered and then declined a COVID vaccine to the portion of your claim that has to do with just the crowding? Certainly, Your Honor. So we would be an inmate who refuses medical care. There has to be some type of attestation or refusal form and we didn't see any of that in the form. So one can perhaps think that this was a self interested refusal that was noted in the records. But for degrees of safety, there has to be a witness attesting to that refusal. And there was none of that found. So we're questioning whether that even took place. And that's somehow built into... Or should be built into our deliberate indifference framework for purposes of the claims? Correct, Your Honor. Not only did he ask for the... Presuming that he did ask for it based on the records and based on the witnesses' observation, he ended up passing away from acute respiratory distress syndrome, which is complications of the coronavirus ailment. And so the argument is that had he had the virus in time, then the symptoms would have been mitigated to an extent, preventing his death. Aside from the fact that when he was symptomatic, aside from the fact that there was a refusal or not, having attended to him in a prompt fashion would have mitigated the full extent of his symptom. When someone suffers from shortness of breath, their oxygen saturation is lowered, and presumably all that would have... Oh, I mean, certainly it appears that perhaps someone missed this and should have caught it. But we need a little bit more of that to establish either the pattern or practice or the failure to train or those claims. Where are you linking that to the county? I mean, there's, I guess, one way to look... What policy were they supposed to have in the middle of developing this developing public health phenomenon that would have... Or did they have that demonstrated deliberate indifference? Well, we know that there was an early release mandate or a planned discharge issued to Mr. Williams indicating that he would be transferred to LA County USC as a result of his comorbid condition, which was suffering from a mental illness along with the symptoms of his condition. So certainly transferring him to the facility early enough, which would have presumably had the right medical equipment to care for his symptoms, may have been one alternative. But aside from that, if an inmate is suffering from noticeable complaints of medical distress, it's upon the medical staff and the jailers to bring that to the medical staff's attention to care for that and to attend to those conditions. So on the failure to train, is there any allegations about the county's policies with respect to medical care, with respect to the individual jailer's responsibilities, the health services? Right. So the one thing we knew that based on the response to the man down after he had died, he was administered Narcan, which is completely unrelated to his condition, and Narcan is given for a drug overdose. So one allegation was that if the county was trained well enough, they would have known that someone who's suffering from shortness of breath is not given automatically Narcan, which is unrelated to his condition. And hence, if the staff were better trained, they would have addressed that in a different fashion. Are there any other instances in your allegations that this was a general practice for purposes of either the training or the policy claims? There wasn't, but certainly that's one. That's not an implausible practice. It is general. But if they're treating everyone generally, irrespective of the conditions, then they're not really trained to address the conditions to begin with. We believe that Mr... And Your Honor, I want to reserve some time for the dismissal of the does, but I'll address that really quickly. Mr. Williams suffered from a comorbid condition of mental... It was mental illness that resulted in him having delusions, and him being unable to communicate his symptoms fully and adequately, and that was known to the county. And so by that fact, in the fact that they failed to attend to his symptoms, that's one of the basis for our failure to train allegation under the substantive claim, which I'd like to briefly address, if it's okay. The district court ultimately dismissed the entire case, the modal allegations, which all hinge on the 14th Amendment and the parental 14th Amendment Due Process Clause, because the does were not named. And plaintiff's counsel have taken all the measures, all the efforts to be able to ascertain those individuals beforehand. What were those efforts? I didn't see any in the response to the order to show cause. We had issued spoliation notices and public records requests to the county, both of which were rejected by the county, and that those documents would at least ascertain who these individual jailers were. The county's response was this was an investigation. So that didn't work. What did you have planned that you might have told the court you were intending to do? We were planning on engaging in discovery, and at least a written set of discovery early interrogatories that would ascertain who the guards were. I want to ask a following question about how that would work, because you've invoked case law where we have suggested that does can be left in if discovery might reveal their identity. But suppose, and I'm just speaking hypothetically, we were to reverse as to the dismissal of the does, but to affirm the dismissal of the claims against the county. How would discovery work on remand? Because the county would, in that hypothetical, not be a party. Would you be able to effectively serve discovery in a way that's going to identify the defendants, and how would that work? I believe so, Your Honor. The discovery would be limited to those core issues of ascertaining the does, but the county has an obligation to defend, and under that obligation, presumably they would present documentations in response to the interrogatory on behalf of the named individuals. But interrogatories can only be given to parties, and the county wouldn't be a party under the hypothetical I'm giving you. Correct. It's my understanding that the county would corroborate, collaborate with their employees in providing the responses to those interrogatories, if I understand the court. Why would they have any obligation to respond as non-parties to the suit? Well, I think, based on my experience having litigated with the county, there's contractual obligations between the employees and the county, where the county would defend, would have a duty to defend, and in that regard... The other problem is, I'm not sure you could even serve interrogatories against the does, because no one becomes a party to litigation until the court acquires personal jurisdiction, and personal jurisdiction is acquired by the service of process. And so it becomes sort of a chicken and egg problem. It's easy to see if the county is still in the case, and the does are hanging there. Then you just serve discovery on the county, the county is a party, the county has to cough up the names, it can't hide behind investigation and defeat the CPRA request. But that wouldn't work under the hypothetical I'm giving you, so that's why I wanted to understand exactly how you're saying this would work. I guess the easier way to go about that is just to keep the county in for the limited purposes of engaging in discovery. Now, do you have case authority that says that we can do that? Not offhand, unfortunately, but I think in terms of... And I'm sorry, I'm running out of time, but... If we're asking you questions, you can continue to answer. In terms of, in essence, allowing discovery to be conducted on the does, there would have to be some type of equitable remedy that would have to be determined, perhaps, and I'd be happy to brief the court on that issue, supplemental briefing, but nothing off the top of my head that I can believe to allow the county to remain at least under the failure to train allegation, subclaim of the Monal based on the facts pled, at least based on the First Amendment complaint. The level of specificity may not need to be as high, but adequate enough to withstand a demur or survival for the First Amendment complaint to keep the county in, and so that's what I would suggest. Okay. All right, we've taken you over your time. I'll give you two minutes for rebuttal. Thank you. So we'll hear now from Mr. Behrer. Did I pronounce that correctly? Perfectly, Your Honor. May it please the court, Daniel Behrer for the County of Los Angeles. First, addressing the dismissal under Rule 4M and 41B. The argument about the California Public Records Act case or request being rejected, and that's why my colleague couldn't identify the does before filing the suit. I have to point out that was pled in the original complaint and the First Amendment complaint, but it was not, as far as I can tell, in the plaintiff's response to the court's order to show cause on failure to serve the does, and it's not even raised in the appellant's opening brief. Of course, that didn't appear to do the plaintiff's much good. What would you recommend they should have done prior to the order to show cause or said in the order to show cause to get discovery into who had the responsibility for checking on? I think a California Public Records Act request is a good idea. We don't know what documents were asked for. The complaint and the First Amendment complaint say they were documents related to the death. We don't know what the documents are, but if they had asked for all the records, medical records, correctional records, and then if the count, he said, we're not going to produce them because they're the subject of an investigation and the police records or personnel records or whatever, the plaintiff has recourse. One, they could have petitioned the court under the California Public Records Act for a writ ordering the county to produce those records. Two, if the county said this is the subject of an ongoing investigation, they could have served another one and another one. They served their CPRA request in March of 2022, according to the First Amendment complaint. They filed suit in August of 2022. They got the order to show cause in January of 2023. There's no showing to the district court, which is the one that exercises its discretion to determine whether there is good cause shown for relieving them from not serving the does within 90 days or this court in the opening brief or in the record as to all the measures that they took to find out who the does were or some information on them. Do you know why the county, your client, didn't provide that information one way or the other? I am not privy to their decision except for what's alleged in the First Amendment complaint. They cited portions of the California Public Records Act case or Public Records Act concerning investigatory files and that it was the subject of an ongoing investigation. In the Central District of California, I think unlike the Northern District, when there's a motion to dismiss, the 26F is deferred and a discovery stay remains in place pending that motion. Is that correct? I don't know that, Your Honor. He couldn't have served discovery, in other words, while this motion was pending. I know in the Northern District, they don't have a local rule that says the opposite, but in the Central District, he didn't have the opportunity to serve discovery while this motion was pending. Because if he did, then that would be an obvious factor that would weigh heavily in your favor. But my understanding of how things work there is that the discovery stay remains in place, the automatic one, until the 26F conference occurs. I believe that's true. And that's the first thing I looked at when I got the case on appeal. But yes, I think Your Honor is correct. What our case law says, you're not supposed to submit, to dismiss those when, you know, you've pleaded allegations about unnamed person. You know the person exists. You know what they did. You've said what they did, but I don't know who they are. And we've said you shouldn't dismiss in those circumstances. But then, what do we do with that? We send it back, and then what? Well, the case where this court said you shouldn't dismiss in those circumstances, I believe it's the Wakefield v. Thompson case. And that's a case where the ground for dismissal was not Rule 4M, which was not, or 41B. It was the fact that this pro se inmate had named only a doe, and the district court said, well, they read a previous Ninth Circuit case, Gillespie is saying does are disfavored in federal court. The Ninth Circuit said, yeah, but you should allow the defendant to explore discovery before dismissing them, unless another law applies. Here, other laws applied, 4B and 41, 4M and 41B. And there really hasn't been a showing that the district court abused its discretion in concluding both of those grounds lay for dismissing the does. And turning to the question of whether... I mean, if the rationale of Wakefield is that ordinarily, in response to the particular ground that was raised in Wakefield, but what we said was that if discovery would reveal their identities, they generally should not be dismissed, that rationale, even though it's in a different context, seems equally applicable to this context. It is a little bit different, Your Honor, in that although this was phrased broadly in Wakefield, the circumstances there was that it was a pro se inmate who was bringing this... Well, I guess he was a former inmate because he had been released, and that was one of the grounds for the Wakefield case. But here, the plaintiffs were represented as early as February of 2022, a few months after the death, because they presented a timely claim or timely relation to the death to the county around that time, according to the complaint. And so, counsel represented them all this time. Counsel fails to show that they have exhausted every means of investigation besides serving this foliation notice and the CPRA request, which apparently they didn't. Why isn't that enough? I mean, so they're counseled, but what good does that do them if the county is not... And I think it is, and the county does not provide the records that were requested upon request. We're not sure exactly how that played out. And because of the rules, we know that the plaintiffs can't get discovery after the county files a motion to dismiss. I mean, so what are we supposed to do in those cases? If they had made a showing to the district court that they had exhausted every other means, such as serving repeat CPRA requests or pursuing the state court remedies for a response that the records are exempt or interviewing... If the county has conceded limited discovery for purposes of discovering the dose in this case, it strikes me... I mean, it's not a technical exhaustion requirement. They just have to give some reasons about the means they're pursuing. Would the county have been open to limited discovery to determine the dose? I don't know if they would have been open to that. As I mentioned, there are avenues outside of discovery by which they could have found out their information. And certainly there are Section 1983 lawsuits filed all the time arising out of inmates' deaths where there are individual defendants identified along with the county. And as to the... But the plaintiff here is deceased, so how is the family supposed to know the names of any of the officers, particularly when the county refuses to provide any information about that? They refused to provide it at that time, which was, I believe the response to the first minute complaint was around May of 2022. They could have made additional CPRA requests. They could have done additional investigation. The resources of plaintiff's firms in finding out who to sue are crucial to their doing business. The discovery is an important means of obtaining information to put together a case, but to put together a complaint, usually by necessity, the investigation is done before it's filed. And there wasn't a showing here, certainly not to the district court and not even to this court, that there was the excusable neglect, which is the sine qua non of obtaining relief or an extension of time to serve defendants under Rule 4M, or that all of the Henderson elements of 41B favored keeping them in instead of dismissing them for failure to prosecute. What's the prejudice that justifies a 41B dismissal here? There was a finding of prejudice and the court, I believe, said that it was a minimal showing of prejudice, just the prejudice of a case going on. And the longer into the case, a doe is brought in. Correct. So it's fairly minimal. And here, there seems fairly good cause and certainly excusable neglect in failing to be able to identify these folks. The county knows the names. It's the only way it can be gotten. And he didn't have any ability to do anything because discovery is barred. And then the CPRA was rejected. It's straight in the complaint. How is that not good cause? And how is it not a sufficient explanation that outweighs in the five-factor balancing the minimal prejudice? I would disagree, Your Honor, that there was excusable neglect here. The sine qua non of excusable neglect is diligence. And the diligence is not shown here because all we have is one spoliation request and one... You have the spoliation and the CPRA request. Yes. Now, maybe the excusable neglect comes in from the fact that it should have been in the response to the OSC. It's in the complaint and why it wasn't brought up as a justifying factor of the district. So maybe that is where you have to look at excusable neglect. But I just don't understand how there isn't... The idea of either good cause or excusable neglect is, is there justification? There certainly seems to be justification for having failed to do what is impossible in the current circumstances with discovery barred. Well, I would disagree, Your Honor, that it is impossible because there are avenues that were not explored. And as long as those avenues remain out there... What are the avenues that were not explored? The avenues that were not explored were pursuing a repetition under the California Public Records Act to challenge the county's denial of these records and or making another CPRA request later, perhaps after the investigation was over. Sometime between the spring of 2022 when the CPRA request was rejected and August 2022 when the complaint was filed or even before January 2023 when the court issued its OSC. And also telling the court, we're pursuing all these avenues to try to find those does. So don't dismiss us yet. Instead of merely saying we should have a chance to pursue discovery, which is what they said in the response to the OSC. I don't know if the court wants me to address the Monell issues. I agree with the questions and the points that the court has made that they just really haven't alleged the ingredients of a failure to train. Well, what else were they supposed to allege beyond the mass congregation at a time where there was COVID was rife through the system of detainees with mental health issues all in all in one place with no precautions other than it sounds like the offer of a vaccine. Well, they could have shown that there was in regard to a failure to train that there was a pattern of inmates who suffered specifically because they didn't train on this particular thing that they said they should have trained on. The failure to train is challenging given that there's only this one incident. But in terms of a generally that that the county is aware that COVID is a significant problem on detainees, they could have alleged facts specifically that they had that they had alternatives and that they chose as a policy or a custom or as a practice to put all of their inmates who had who showed who had mental illness into this situation despite the objectively the risk being too great. Well, your friend notes that they did. I mean somewhat tragically in this case, they did screen him out for eventual move to another program, but that didn't appear to occur with at least sufficient urgency in this case. It didn't occur before. I believe that it was the bomber was talking about what would happen upon his release and these events happened before he was released. But in the meantime, they had to care for his mental illness, which they did by issuing him medications, examining him, putting him in a mental health examination cell, which is the opposite of deliberate indifference, which is knowing the  which is obviously not working. Unless there's any further questions, I'll submit. All right. Thank you, counsel. So we'll hear rebuttal now from Mr. Saha. Thank you, Your Honor. Just briefly on the point that counsel suggested that every avenue of recourse should have been exhausted pre-litigation. I don't believe there's any authority that dictates that plaintiff's counsel should have submitted, you know, 3, 4, 5, 7, 6, whatever number follow-ups on the CPRA. As we know from experience, these are oftentimes rejected or requested to be extended at the detriment of a plaintiff's case. Did you make an attempt after... Did you know that the investigation had a completion date certain and did you make an attempt... Did you check back and make an attempt after your first attempt? I did not have a completion date, but I did not attempt. I was intending on initiating suit so we can engage in discovery. So the evidence will not be stale in that regard, but I certainly did not do so because my intention was to obtain that information through discovery. How did you intend to get around the perhaps foreseeable Rule 26 problem that if there were a motion to dismiss, their discovery would be stayed? Well, oftentimes a protective order is entered into in federal cases that will allow the agency from disclosing that type of information. Did you ask the district court... I mean, could you ask the district court to lift the discovery stay for a particular purpose? And so why didn't you ask for the stay to be lifted so that you could just... For the limited purpose of serving interrogatories on the county while they're still here, give me those names. You could have done that. I could have, Your Honor. I just didn't know that was an option. I just... From practice, I know that discovery doesn't initiate until the Rule 26 conference, like you indicated. But sometimes you have a need up front, and you certainly did. And now the scenario is a lot more complicated if the county gets out of the case. Yes, I realize that. I just didn't know that those rules could be accepted because of my circumstance, and that's the reason I did not request the court to lift the discovery stay. And besides that, if there are any other questions, Your Honor. Okay. All right. Thank you, Counselor. Thank you, Your Honor. The case just argued will be submitted, and that concludes our calendar for this morning. All rise. Hear ye, hear ye. All persons having had business with the Honorable, the United States Court of Appeals for the Ninth Circuit shall now depart for this court for this session. Session stands adjourned.
judges: COLLINS, THOMAS, JOHNSTONE